1
2
3
4
5
6

FILED
CLERK, U.S. DISTRICT COURT

AUG − 4 2009

CENTRAL DISTRICT OF CALIFOR
BY                              DEPUTY

7          UNITED STATES DISTRICT COURT
8          CENTRAL DISTRICT OF CALIFORNIA
9

10   UNITED STATES OF AMERICA,              CV 04-8182 CBM (RNBx)
11            Plaintiff,
12   FALLBROOK PUBLIC UTILITY            **FINDINGS OF FACT AND**
     DISTRICT,                          **CONCLUSIONS OF LAW**
13
              Plaintiff-Intervenor,
14
              v.
15
     EASTERN MUNICIPAL WATER
16   DISTRICT and RANCHO
     CALIFORNIA WATER DISTRICT,
17
              Defendants.
18
19

20        The matter before the Court, the Honorable Consuelo B. Marshall, United States

21   District Judge presiding, is the bench trial held on Plaintiffs' claims for declaratory and

22   injunctive relief regarding Defendants' export of treated wastewater from the Santa

23   Margarita River watershed, and Plaintiffs' contract-related claims arising from the

24   parties' 1990 agreement concerning the same treated wastewater.  Upon consideration of

25   the testimony and evidence received, and the Court's evaluation of the demeanor and

26   credibility of the witnesses, the Court makes the following findings of fact and

27   conclusions of law pursuant to Fed. R. Civ. P. 52(a).  The parties stipulated to a number

28   of facts before trial; stipulated facts relevant to the Court's decision and supported by the

evidence are incorporated herein.

## JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1345.

## FINDINGS OF FACT

## I.   BACKGROUND

1.     The Santa Margarita River ("SMR") watershed is the second largest watershed in the San Diego hydrologic region.  It covers approximately 750 square miles, encompassing more than 493,428 acres, with about three quarters of the watershed lying in Riverside County and about one quarter in San Diego County.  (Stipulation of Facts, filed Feb. 26, 2008 ("Stip."), ¶ 13.)

2.     The SMR watershed includes nine hydrologic areas:  Ysidora, De Luz, Murrieta, Auld, Pechanga, Wilson, Cave Rocks, Aguanga, and Oak Grove.  Major water bodies in the SMR watershed include the SMR, Temecula Creek, Murrieta Creek, Rainbow Creek, Sandia Creek, De Luz Creek, Lake O'Neill, Santa Margarita Lagoon, Vail Lake, Skinner Reservoir, and Diamond Valley Lake Reservoir.  (Stip. ¶ 13.)

3.     The upper part of the SMR watershed is primarily drained by two major tributaries of the SMR:  Murrieta Creek and Temecula Creek.  (Stip. ¶ 11; Shahroody Tr. Day 1 at 115:4-14.)  The SMR is formed by the confluence of these two creeks.  (Stip. ¶ 11.)

4.     From the confluence of the Murrieta and Temecula Creeks, the SMR flows to a rocky formation known as "the Gorge."  Geographically, the Gorge acts as a demarcation point.  The watershed area upstream from the Gorge is known as the "Upper Basin" and comprises approximately 588 square miles, or 80 percent, of the SMR watershed area.  The watershed area downstream from the Gorge is known as the "Lower Basin."  (Shahroody Tr. Day 1 at 115:18-117:15, Day 15 at 3553:2-3554:19.)

5.     Hydrologically, the Gorge acts as a funnel or chokepoint.  Subsurface and groundwater flows are forced to the surface when they reach the rocky formation that forms the Gorge.  All flows upstream of the Gorge (*i.e.*, in the Upper Basin) must pass through the Gorge to travel downstream to the Lower Basin.  (Shahroody Tr. Day 1 at

115:18-117:15; Williams Tr. Day 13 at 3051:1-3052:5; Theisen Tr. Day 6 at 1300:6-1301:1.)  The United States Geological Service has a gauging station located at the Gorge, which makes continuous measurements of the flow passing through the Gorge, including measurements of flow rate and salt concentrations.  (Shahroody Tr. Day 1 at 117:16-118:14; Williams Tr. Day 13 at 3052:6-3052:10.)

6.    Below the Gorge, the SMR flows downstream to the Pacific Ocean.  (Shahroody Tr. Day 1 at 118:15-117:15.)  At the downstream end of the SMR, there is an estuary.  (Stip. ¶ 12.)

7.    Rapid urbanization and development of the Upper Basin over the past twenty to thirty years have contributed to adverse changes in water quantity and quality in the lower portion of the SMR watershed.  (Carlson Tr. Day 2 at 346:8-16; 360:14-25; Shahroody Tr. Day 1 at 165:20-166:10; Day 2 at 234:5-236:5; 251:14-253:9; 261:18-262:10; 265:23-25; Theisen Tr. Day 6 at 1193:17-1195:6.)  Human activity has also negatively impacted the biotic integrity of the watershed.  (Exh. 1747_00006-7, 35.)

8.    By the early 2000s, the Upper Basin was considered one of the fastest growing urban areas in California.  During that period, the City of Temecula saw its population grow at rates of more than 18 percent.  The City of Murrieta saw population growth in excess of 11.5 percent during 2001 alone.  (Exh. 192_00002.)

9.    In contrast to the Upper Basin, the Lower Basin has remained relatively undeveloped, due to the existence of several large public and private land reserves.  (Storey Tr. Day 1 at 65:6-66:6; Shahroody Tr. Day 1 at 120:1-122:5; Exh. 192_00002.)

10.   In 1990, a water protection study prepared jointly for the four parties involved in this lawsuit concluded that increased development projected for the Upper Basin could significantly impact the quality of downstream groundwater basins.  Specifically, the study predicted that levels of Total Dissolved Solids ("TDS"), or salts, in those downstream groundwater basins could rise by 50 to 100 mg/L.  (Welch Tr. Day 12 at 2663:19-2664:14, 2733:8-2734:1; *see also* Exh. 112.)

11.   In California, the agency with primary responsibility for administering water rights

and protecting water quality is the State Water Quality Control Board ("State Board"). *El Dorado Irr. Dist. v. State Water Resources Control Bd.*, 142 Cal. App. 4th 937, 950 n.6 (Cal. Ct. App. 2006); (Exh. 1795_00004.)  Certain responsibilities of the State Board have been delegated in the first instance to nine Regional Water Quality Control Boards. The regional board responsible for the SMR watershed is the San Diego Regional Water Quality Control Board ("Regional Board").  (Exh. 1795_00004; Exh. 1814_ 00023.) These water quality control boards are responsible for implementing state and federal water quality protection laws.  (*See* Exh. 1814_00036.)

12.    One of these laws required every state to submit water quality control plans for each planning area within the state by July 1, 1975 (Exh. 1795_00004); these plans were then subject to review and approval by the United States Environmental Protection Agency ("EPA").    In general, these water quality control plans:

    a.    identify all beneficial uses of all water bodies in the region (that is, uses of water the state will devote resources to protecting, such as municipal water supply, industrial water supply, fishing, boating, swimming, etc.), and the water quality objectives that will be used to protect those beneficial uses. (Theisen Tr. Day 6 at 1160:19-24; 1161:9-15; Exh. 1795_00026.)

    b.    include implementation plans for how the regional boards will adopt waste discharge requirements, issue permits to comply with water quality objectives, and ensure the protection of identified beneficial uses.  (Theisen Tr. Day 6 at 1160:25 - 1161:3.)

    c.    include limitations on pollutants that can be discharged into the covered water bodies.  (Theisen Tr. Day 6 at 1163:4-20.)

13.    The Regional Board adopted the first Water Quality Control Plan for the San Diego Basin ("San Diego Basin Plan") in 1975, and the EPA subsequently approved that plan.  (Stip. ¶ 15; Exh. 1795.)  This plan incorporated a position statement from the State Department of Health ("DHS") regarding the use of reclaimed water (*i.e.*, treated wastewater) to augment the domestic water supply.  (Exh. 1795_00184 - 1795_186.)

1    This position statement, entitled "Position on Basin Plan Proposals for Reclaimed Water

2    Uses Involving Ingestion," indicated that DHS would accept certain proposals to

3    recharge groundwater sources by surface spreading of reclaimed water, but would not

4    accept plans for direct discharge of reclaimed water into domestic water supply systems

5    without additional research into the long-term health effects of such use.  (Exh.

6    1795_00185.)

7    14.    Basin plans are subject to regular revision and amendment.  (Exh. 1814_00042.)

8    By 1994, the San Diego Basin Plan:

9        a.    expressly encouraged the use of reclaimed water for various applications,

10              including stream and lagoon replenishment, and stated that the Regional

11              Board would consider special amendments to the Basin Plan to encourage

12              reclamation projects.  (Orton Tr. Day 15 at 3448:25-3449:14, 3450:4-

13              3451:1, 3451:9-25; Exh. 1814_00182-83.)

14       b.    provided that the requirements for using reclaimed water to recharge

15              groundwater sources would be set on a case-by-case basis, considering

16              factors such as treatment provided, effluent quantity and quality, and

17              distance to withdrawal.  (Orton Tr. Day 15 at 3446:16-3447:6; Exh.

18              1814_00185.)

19   **II.    THE PARTIES**

20       **A.    The United States of America**

21   15.    The lead plaintiff in this action, the United States, is here acting on behalf of the

22   United States Marine Corps Base at Camp Pendleton ("Camp Pendleton" or the "Base").

23   Established in 1942, Camp Pendleton is a military facility encompassing approximately

24   125,000 acres and 200 square miles within San Diego and Orange Counties, California.

25   Camp Pendleton includes land encompassing the lower SMR and its tributaries from the

26   mouth of the river upstream towards the Gorge.  (Stip. ¶ 1.)

27   16.    Camp Pendleton is one of the largest United States military bases.  It is the only

28   amphibious military base on the West Coast and is one of only two amphibious bases in

the continental United States. (Storey Tr., Day 1 at 69:22-70:10.) Camp Pendleton also contains an air base. (Storey Tr., Day 1 at 64:12-22.)

17.     Camp Pendleton is part of a larger Naval Enclave, which also includes the United States Naval Hospital and the Naval Ammunition Depot. As part of the Naval Enclave, Camp Pendleton employs military and civilian personnel, provides housing and training facilities for units of the United States Armed Forces, and provides logistic support to house and train units of the United States Marine Corps. (Stip. ¶ 2.)

18.     There are presently three to four battalions from Camp Pendleton serving rotating cycles in Iraq and Afghanistan. (Storey Tr., Day 1 at 60:21-61:14.) The Base population averages between 80,000 to 90,000 people living and working on the Base each day. The number has increased in recent years, and Congress has authorized significant additional growth, which will result in an increase of several thousand more marines and support staff. (Storey Tr., Day 1 at 66:24-68:11.)

19.     Camp Pendleton and other components of the Naval Enclave are located near the mouth of the SMR, downstream of the Gorge. (Stip. ¶ 2.)

20.     The aquifer system containing Camp Pendleton's primary water supply is also located downstream of the Gorge in San Diego County, California. This system includes the Upper Ysidora, Chappo, and Lower Ysidora Sub-basins on Camp Pendleton. The water storage capacity in these sub-basins, down to a depth of 100 feet, is 12,500, 27,000, and 8,600 acre-feet, respectively. Camp Pendleton relies upon surface water from the SMR, tributary inflow from other creeks and drainages, and precipitation to recharge its aquifer system. (Stip. ¶¶ 3, 14.)

21.     Water of a reasonable quality and quantity is needed to meet the water use requirements at Camp Pendleton. (Stip. ¶ 14.)

**B.     Fallbrook Public Utility District**

22.     Fallbrook Public Utility District ("Fallbrook PUD"), a public entity formed in 1922 under California Public Utility Code §§ 16000 *et seq.*, was originally established to provide potable water service to customers within its jurisdictional boundaries. (Stip.

6

¶ 4.)

23.    In 1994, Fallbrook PUD's services expanded when it took over sewer service responsibilities within a 4,200-acre section in the downtown area of the community of Fallbrook.  Today, Fallbrook PUD provides imported water and wastewater treatment services to its residents, who live on 28,000 acres in the community of Fallbrook, and provides recycled water for irrigation to local parks and businesses.  (Stip. ¶ 4.)

24.    Fallbrook PUD's principal place of business is in the community of Fallbrook, within the unincorporated area of northern San Diego County, California.  (Stip. ¶ 4.)

### C.    Eastern Municipal Water District

25.    Eastern Municipal Water District ("Eastern"), a public entity formed under California law in 1950, is charged with the duties, *inter alia*, of supplying and distributing water, treating and discharging wastewater, and managing water resources within its boundaries, which  include portions of the SMR watershed.  Eastern's principal place of business is Perris, Riverside County, California.  (Stip. ¶ 7)

26.    In 1962, Eastern began providing wastewater treatment services to customers within its service areas and became involved in the production and sale of recycled water.  (Stip. ¶ 8.)

27.    Eastern is divided into five sewer service areas.  Each service area is served by a single treatment facility.  Eastern's Temecula Valley Regional Water Recycling Facility ("Temecula Plant"), previously known as the Rancho California Regional Reclamation Facility, is located along Murrieta Creek two miles upstream of the confluence of Murrieta and Temecula Creeks.  The Temecula Plant is Eastern's only treatment plant located in the SMR watershed.  Eastern's other plants are located in the Santa Ana River watershed.  (Stip. ¶¶ 8-9.)

28.    Eastern has not pumped native water from the SMR watershed since 2002.  (Bachmann Tr., Day 13 at 3006:10-24.)  Eastern presently serves its potable water customers in the SMR watershed solely with water imported from the Metropolitan Water District of Southern California ("MWD").  (Bachmann Tr., Day 13 at 3006:25-

3007:11.)

29.     Eastern also sells some of this imported water to Co-Defendant Rancho California Water District ("Rancho"). (Exh. 1865_03877, 03884 (Watermaster Report WY 05-06 at Tables B-1 and B-8).)

30.     Eastern provides sewer services both to its own potable water customers and to Rancho's potable water customers who reside in the "Rancho Division" of Rancho's service area. Some of the potable water delivered by Rancho to its customers in the Rancho Division is native SMR water. As a result, some portion of the sewage treated by Eastern at the Temecula Plant originated as native water. (Stip. ¶¶ 7-10.)

### D.     Rancho California Water District

31.     Rancho is a public entity organized and created in 1965 under the California Water District Act, California Water Code §§ 34000 *et seq.*, and is charged with the duties, *inter alia*, of supplying and distributing potable water, treating and discharging wastewater, and managing water resources within its boundaries, including portions of the SMR watershed. Rancho's principal place of business is Temecula, Riverside County, California. (Stip. ¶ 5.)

32.     Rancho's service area is located in the Upper Basin of the SMR watershed. Rancho both pumps native water and imports water for domestic consumption within its boundaries. In recent years, Rancho has pumped an average of 20,000 to 25,000 acre-feet per year from groundwater wells located in the SMR watershed, and imported approximately 65,000 acre-feet of potable water annually. (Lemons Tr. Day 10 at 2317:3-2318:6.)

33.     Rancho has two divisions: the Rancho Division and the Santa Rosa Division. Rancho provides only potable water services to the Rancho Division (because, as noted above, Eastern provides sewer service to that division). (Stip. ¶ 6.) Sewage from the Santa Rosa Division is treated at Rancho's Santa Rosa Water Reclamation Facility ("Santa Rosa Plant"). (Stip. ¶ 6; Lemons Tr. Day 10 at 2331:11-23.)

34.     The Santa Rosa Plant is located along Murrieta Creek, approximately five miles

upstream from the confluence of Murrieta and Temecula Creeks.  (Stip. ¶ 6.)  The Santa Rosa Plant is connected to Eastern's Temecula Plant through a raw sewage transfer facility.  (Lemons Tr. Day 11 at 2434:8-20, 2578:9-2579:6.)

## III.   THE PARTIES' RIGHTS TO WATER IN THE SMR WATERSHED

### A.   Previous Litigation Over Rights to the SMR

35.   Plaintiffs, Camp Pendleton and Fallbrook PUD, request that the Court make certain determinations as to their rights to water in (or which they contend should be in) the SMR watershed.  Litigation over the SMR waters goes back at least 85 years, and has (so far) resulted in multiple trials consuming years of court time, at least one published opinion from the California Supreme Court, at least one published opinion from the California Court of Appeal, at least three published opinions from the Ninth Circuit, and at least six published decisions from the Southern District of California (the "Southern District").  (*Rancho Santa Margarita v. Vail*, 11 Cal. 2d 501 (1938); *Fallbrook Pub. Util. Dist. v. Martin*, 151 Cal. App. 2d 84 (Cal. Ct. App. 1957); *Fallbrook Pub. Util. Dist. v. U.S.D.C.*, 202 F.2d 942, 943 (9th Cir. 1953); *California v. United States*, 235 F.2d 647, 653 (9th Cir. 1956); *United States v. Fallbrook Pub. Util. Dist.*, 347 F.2d 48 (9th Cir. 1965); *United States v. Fallbrook Pub. Util. Dist.*, 101 F. Supp. 298 (S.D. Cal. 1951); *United States v. Fallbrook Pub. Util. Dist.*, 108 F. Supp. 72 (S.D. Cal. 1952); *United States v. Fallbrook Pub. Util. Dist.*, 109 F. Supp. 28 (S.D. Cal. 1952); *United States v. Fallbrook Pub. Util. Dist.*, 110 F. Supp. 767 (S.D. Cal. 1953); *United States v. Fallbrook Pub. Util. Dist.*, 165 F. Supp. 806 (S.D. Cal. 1958); *United States v. Fallbrook Pub. Util. Dist.*, 193 F. Supp. 342 (S.D. Cal. 1961).)[1]  Most of these decisions stem from two major

---

[1] Not to mention significant public controversy over the issues raised in these cases, resulting in (among other things) Congressional hearings on several occasions *(see, e.g.*, 101 F. Supp. at 301-02; 165 F. Supp. at 817); an act of Congress cutting off funding to the Justice Department in an attempt to end the federal government's prosecution of the *United States v. Fallbrook Public Utility District* case (202 F.2d at 943 (discussing Dept. of Justice Appropriations Act of 1953, 66 Stat. 556, § 208(d) (July 10, 1952)); and an act of Congress attempting

9

cases involving the water rights of landowners in the SMR watershed: *Rancho Santa Margarita v. Vail, et al.*, Case No. 42850, filed in San Diego Superior Court in 1923 (the "State Court Action"); and *United States v. Fallbrook Public Utility District, et al.*, Case No. 51-1247, filed in the United States District Court for the Southern District of California in 1951 ("the Fallbrook Case").

36.     The State Court Action was initiated in 1923 by Rancho Santa Margarita ("RSM"), which owned large tracts of land in the Lower Basin near the mouth of the SMR.  The main defendants in the case were individuals and entities associated with the Vail family, major landowners in the Upper Basin (referred to in prior court decisions as the Vail Estate, the Vail Ranch, the Vail Company, the Vails, or simply Vail).   After a three-year trial begun in 1926, judgment was entered in 1930.  The trial court made findings regarding the total number of riparian acres of land each party owned, and the number of those riparian acres that were "capable of and adapted to practical and profitable irrigation." (11 Cal. 2d at 519.)  Further, the trial court found that "the normal flow of the Temecula-Santa Margarita River is not sufficient to supply either [RSM or Vail family], and . . . there is only enough water available for the irrigation of a portion of their riparian lands and for the uses thereon which are most valuable and profitable." (11 Cal. 2d at 516-17.)  Accordingly, the court found that RSM was entitled to three quarters of the surface flow of the SMR (exclusive of the flow of Murrieta Creek), and that Vail was entitled to one quarter of the surface flow of the SMR, plus all of the Murrieta. (11 Cal. 2d at 518.)  The court therefore enjoined Vail from diverting more water than the amount awarded to it, and from using water on certain of its lands.  (11 Cal. 2d at 518.)

37.     Eight years later, on appeal, the California Supreme Court held that the trial

---

"to settle the litigation by legislation" (151 Cal. App. 2d 84 (citing Pub. L. 547, 68 Stat. 575, July 28, 1954)).  The Ninth Circuit later referred to "improper interference legislatively to prevent a hearing in one of the courts of the nation." (235 F.2d at 653.)

court's determination of the amount of riparian land held by each of the parties to the State Court Action was incorrect. (11 Cal.2d at 544-45.) Further, the court held that it was improper to enjoin the use of water based on the extent of riparian ownership, rather than on the riparian owner's current needs and uses for the water. (11 Cal. 2d at 550.) While noting that the parties had essentially stipulated to the fact that there was not sufficient water in the main channel of the SMR to fill all of the reasonable beneficial uses of either party (11 Cal. 2d at 545), the court stated that "[t]here is not one word in the findings that there has ever existed a deficiency in the underground basins on [RSM's] property which are filled by the flow of the Temecula-Santa Margarita River." (11 Cal. 2d at 554.) The court therefore remanded for a new trial, both to find the correct extent of riparian lands owned by the parties, and to determine whether an injunction should issue. (11 Cal. 2d at 565-66.) Eventually, however, the litigation was settled by an agreement between the parties, which apportioned the waters of the SMR two-thirds to RSM and one-third to Vail. (Exh. 1765 (Stipulated Judgment, *Rancho Santa Margarita v. Vail*, Case No. 42850 (San Diego Sup. Ct. Dec. 26, 1940) ("1940 Stipulated Judgment")); Lemons Tr. Day 10 at 2319:12-20; 347 F.2d at 58.) The agreement also provided that the parties could use the apportioned water on specified nonriparian land. (347 F.2d at 53.) The agreement was incorporated, by stipulation, into a court decree entered December 26, 1940 in the State Court Action (the "1940 Stipulated Judgment"). (Exh. 1765; Stip. ¶¶ 104, 118; 347 F.2d at 53.)

38.    None of the parties currently before the Court was involved in the State Court Action. However, not long after entry of the 1940 Stipulated Judgment in that case, the United States acquired RSM, along with its water rights and standing to enforce the 1940 Stipulated Judgment. (Exh. 1739; *see* 235 F.2d at 652.) Later, Rancho acquired at least some of the water rights previously held by the Vail Company, although the current record does not establish whether Rancho acquired all such rights held by the Vail entities, or in exactly what manner Rancho may have acquired them. Nonetheless, the parties seem to agree that Rancho succeeded to enough of the rights -- and obligations --

of Vail to be bound as its successor under the 1940 Stipulated Judgment. (Modified Final Judgment and Decree, *United States v. Fallbrook Pub. Util. Dist.*, No. 51-1247-SD-C (S.D. Cal. April 6, 1966) ("1966 Judgment"); Stip. ¶ 118.)  Fallbrook PUD and Eastern, however, do not appear to be so bound.

39.    The Fallbrook Case, on the other hand, was initiated by the United States, and both Fallbrook PUD and the Vail Company were named defendants.  In 1951, the United States brought suit against approximately 3,600 upstream users to quiet title to its rights to the use of the waters of the SMR system.  (347 F.2d at 51; Exh. 813_00069.)  The court originally proposed to try only the issues between the United States as plaintiff and the three following defendants:  Fallbrook PUD, the smaller Santa Margarita Mutual Water Company, and intervenor the State of California.  The case against Fallbrook PUD was stayed by the Ninth Circuit, however, so the trial went forward in late 1952 solely against the Santa Margarita Mutual Water Company and the State of California.  (109 F. Supp. at 29.)

40.    The Ninth Circuit denied Fallbrook PUD's request for a writ of mandate in 1953 (202 F.2d at 943), but three years later, on March 30, 1956, reversed the judgment entered by the trial court after the 1952 trial.  (235 F.2d at 664.)  The Ninth Circuit disapproved the issuance of a judgment purportedly binding only the three parties to the trial, but essentially establishing the government's rights to waters against all other users on the SMR.  The Circuit noted that one of the main reasons the trial court may have erred was its misconception of the effect of the 1940 Stipulated Judgment on the rights of the parties.  (235 F.2d at 654-55.)  Specifically, the Ninth Circuit reversed the trial court's finding that there was no surplus water in the SMR at the time of trial, since this was largely based on the 1940 Stipulated Judgment, which could not be binding on anyone not a party to it.  The Ninth Circuit held that the 1940 Stipulated Judgment's requirement that Vail release three cubic feet of water per second at the Gorge was binding on Vail, but noted that "the release at that point is obviously not a delivery to the United States. It only means that Vail was not entitled to any use of water unless and

until there had been such a quantity released. It must be assumed that the rights of the intervening landowners and appropriators between the point of release and the boundary of [RSM] must have been considered. In any event, neither the state court nor [RSM] and Vail had power to bind such parties or the State of California." (235 F.2d at 657.) The court further noted that the amount of water in the SMR varied from year to year, and that "[i]t is certain from the evidence in the case that in some years there is surplus water which flows clear through the watershed and wastes into the sea." (235 F.2d at 659.)

41.     After remand, trial was set to begin October 1, 1958 (165 F. Supp. at 812); in pretrial rulings, the court acknowledged the Ninth Circuit's holding "that it was error for the trial court to enter a separate judgment in the case as to less than all the defendants." (165 F. Supp. at 822.)  Accordingly, the court began a process of entering interlocutory judgments addressing discrete issues, parties, and sections of the SMR.  In one of these interlocutory judgments (No. 25), the court enjoined all parties from attempting to enforce the 1940 Stipulated Judgment, based in part on the fact that several thousand water rights holders had not been parties to the State Court Action, and that the 1940 Stipulated Judgment's attempt to allocate all the waters of the SMR thus could not be valid.  The court rejected the contention that the 1940 Stipulated Judgment was a contract between the United States and Vail, pooling their respective riparian rights to the SMR and splitting them by agreement.  Further, the court found that if the 1940 Stipulated Judgment were a contract, Vail was entitled to rescind.  In short, the 1940 Stipulated Judgment was no longer (if it had ever been) an equitable apportionment of the riparian rights to the SMR.  (Interlocutory Judgment No. 25, *United States v. Fallbrook Pub. Util. Dist.*, No. 51-1247-SD-C (S.D. Cal. April 25, 1961); 193 F. Supp. at 352-58.)  After several years and 45 Interlocutory Judgments, the court issued its Final Judgment and Decree on May 8, 1963 ("1963 Judgment") incorporating by reference and formalizing the previous 45 interlocutory orders.  (1963 Judgment, *United States v. Fallbrook Pub. Util. Dist.*, No. 51-1247-SD-C (S.D. Cal. May 8, 1963).)

42.     On appeal, the Ninth Circuit affirmed in part, reversed in part, and remanded.

(347 F.2d at 61.)  The only issue on which the Circuit reversed the District Court was the question of the continuing validity of the 1940 Stipulated Judgment.  The Ninth Circuit held that the 1940 Stipulated Judgment "must be construed as a division between the United States and the Vail Ranch of such riparian rights as they possess in combination." (347 F.2d at 58.)  Thus, the agreement was essentially a contract enforceable by the United States against Vail.  (347 F.2d at 61.)

43.     After remand, the District Court acknowledged the Ninth Circuit's decision, and modified the 1963 Judgment accordingly.  The court withdrew Interlocutory Judgment No. 25, and entered a modified final judgment holding that the 1940 Stipulated Judgment constituted a valid and binding agreement, enforceable against the parties thereto.  This "1966 Judgment" thus incorporated the 1940 Stipulated Judgment, and re-finalized the other 44 interlocutory judgments in the case.  Notably, the court also stated in the 1966 Judgment that "the Vail Company's successor in interest, Rancho California, has now appeared voluntarily in the case."  (1966 Judgment at 4.[2])

44.     Unfortunately, the 1966 Judgment did not resolve all disputes over water rights to the SMR.  Less than two years later, the Southern District noted that "[i]t has long been recognized by the Court, the United States of America and the Fallbrook Public Utility District that the [1966 Judgment] leaves unsolved many serious problems with respect to the use of the waters of the Santa Margarita River Stream System . . . ."  (Exh. 1168_00001.)  Notably, the 1966 Judgment did not attempt to allocate specific amounts of water to any party, but simply enumerated what type of water rights each party had, and what the respective priorities of those rights were.  (Exh. 1168_00001.)  However, several parties have since tried to settle at least some aspects of the dispute.  For instance, Fallbrook PUD and the United States have been working together for at least 40 years now in pursuit of a joint water storage project.  (Exh. 1168; *see infra* Part III.B.iii.)  In 1990, the United States, Fallbrook PUD, Rancho, and Eastern entered into

---

[2] The Court takes judicial notice of both the 1963 and 1966 Judgments.

the so-called Four Party Agreement. (Exh. 49; *see infra* Part V.)

45.     More recently, however, the United States and Rancho entered into an agreement to clarify their obligations under the 1940 Stipulated Judgment. This Cooperative Water Resource Management Agreement ("CWRMA") was executed by Camp Pendleton and Rancho on March 26, 2002. (Notice of Errata re: Stipulation & Order Approving Cooperative Water Resource Management Agreement, Case No. 51-1247-SD, at 23 (S.D. Cal. August 27, 2002); Stip. ¶ 119; Exh. 438.) The CWRMA acknowledges that the parties are bound by two prior court judgments: the 1940 Stipulated Judgment in the State Court Action, and the 1966 Judgment in the Fallbrook Case. The CWRMA also recognizes, however, that "these Judgments do not fully meet the needs of the parties for effective water management under present conditions," and that the "meanings of certain provisions of the 1940 Judgment are also in dispute." (Exh. 438_00001 (CWRMA ¶ 1).) The purpose of the CWRMA was therefore "to manage these water resources in a practical way that will meet their needs, consistent with the essential rights and obligations of the two Judgments, while avoiding potential conflicts over disputed provisions." (Exh. 438_00001 (CWRMA ¶ 1).) Thus, the CWRMA provides that the terms of the 1940 Stipulated Judgment are suspended, and that the parties will forego enforcing any rights under the 1940 Stipulated Judgment so long as the CWRMA is in effect. (Exh. 438_00002-03 (CWRMA ¶ 4).) The CWRMA was approved by the Southern District of California in 2002 in the Fallbrook Case. In approving the CWRMA, the Southern District found it had continuing jurisdiction to enforce the agreement. (Stip. ¶ 104; Stip & Order Approving CWRMA, Case No. 51-1247-SD (S.D. Cal. Aug. 20, 2002).) Neither Fallbrook PUD nor Eastern is a party to the CWRMA. (Exh. 438; McPherson Tr. Day 5 at 917:7-22; 919:22-921:10.)

46.     By 1989, as part of its continuing jurisdiction over the Fallbrook Case, the Southern District had appointed a Watermaster to administer and enforce the 1966 Judgment and other orders of the court. The Southern District also appointed a Steering Committee to assist the court and the Watermaster, made up of representatives from the

four parties in this case (the United States, Fallbrook PUD, Eastern, and Rancho), plus the MWD and the Pechanga Tribe. (Exh. 1865_00013.)

47.     Finally, since litigation over the SMR began, the SMR has been designated a "fully appropriated" stream. (Wilson Tr. Day 14 at 3266:12-14.)

### B.     Plaintiffs' Current Water Rights

#### i.     Camp Pendleton

48.     All parties agree that Camp Pendleton has riparian rights to SMR water. (Stip. ¶¶ 104, 116.) Further, these rights were examined by the Southern District in the Fallbrook Case, which, in Interlocutory Judgment No. 37, made specific findings as to what lands owned by the United States within the Naval Enclave were riparian, and had correlative riparian rights to the use of the waters of the SMR. (Exh. 1739.) Camp Pendleton has historically exercised these rights and continues to exercise these rights. (Stip. ¶ 116.)

49.     Camp Pendleton also has appropriative rights to SMR water:

    a.     Camp Pendleton has a pre-1914 appropriative water right[3] to divert water from the SMR for storage in Lake O'Neill in the amount of 1,200 acre-feet per year ("AFY") (including 100 acre feet of dead storage and losses) at a diversion rate of 20 cubic feet per second ("CFS") for the purposes of military training, recreation, and subsequent groundwater recharge, with a

_____

[3] Prior to 1914, appropriative rights "were acquired by actual diversion and use of the water." *United States v. State Water Resources Control Board*, 182 Cal. App. 3d 82, 102 (Cal. Ct. App. 1986). Since 1914, the method for acquiring such rights has been provided by statute. *Id.* Applications for permits to appropriate must be made to the State Board, setting forth the quantity of water desired and any construction necessary to appropriate it. *Id.* at 102. Permits issued by the State Board give the permit holder the right to take and use water according to the permit's terms. *Id.* However, the right does not become final until the holder has complied with the permit's terms, and the State Board has issued a license. Until then, the State Board may reserve jurisdiction to amend the permit's terms, and if the holder "violates any of the terms or conditions or fails to apply the water to a beneficial purpose, the Board may revoke the permit or license." *Id.*

priority date of 1883.  (Stip. ¶ 116; Exh. 1737_00010-12.)  This right was
recognized by the Southern District in the Fallbrook Case, in Interlocutory
Judgments No. 24 and 24A.  (Exh. 1737; Interlocutory Judgment No. 24A
Pertaining to Lake O'Neill Stipulation, *United States v. Fallbrook Pub. Util.
Dist.*, No. 51-1247-SD-C (S.D. Cal. May 7, 1963).[4])

b.    Camp Pendleton also has a vested statutory appropriative right to divert up
to 4,000 AFY from the SMR (collected to underground storage and
subsequently extracted and placed to beneficial use) for underground
storage and recharge of its groundwater basins, without any limit on the rate
of diversion.  Camp Pendleton has historically exercised this right and
continues to exercise this right, which has a priority date of September 23,
1963.  This right is reflected in License No. 10494, issued in 1975.  (Stip. ¶
117; Exhs. 1756; 1173.)

c.    In addition, Camp Pendleton has Permit No. 15000, issued November 18,
1965 (also with a priority date of September 23, 1963) to the United States
Department of the Navy (the "Navy") and now held on the Navy's behalf by
the Bureau of Reclamation, for the appropriation and storage of up to
165,000 AFY from the River.  (Stip. ¶ 104; Exhs. 1168, 1174, 1179, 1746.)
To date, this right remains unexercised, has not vested, and no license has
yet issued.  (*See infra* Part. III.B.iii.)

50.    Finally, Camp Pendleton has contract rights to deliveries of water pursuant to the
CWRMA:

a.    Pursuant to the terms and conditions of the CWRMA, Rancho guarantees
winter and monthly minimum flows of water at the Gorge; if flows should
fall below agreed upon minimum amounts, Rancho will release make-up
water into the SMR.  (Stip. ¶ 120; Exh. 438_00006.)

---

[4] The Court hereby takes judicial notice of Interlocutory Judgment No. 24A.

b.   The make-up water released by Rancho could consist of water from several sources:  Rancho's wells upstream from the Gorge; flows from the Live Stream Discharge project under the Four Party Agreement (*see infra* Part V); deliveries from Rancho's domestic water system; imports from the MWD; or releases from the Vail Reservoir.  (Exh. 438_00009-10.)

c.   The parties intended the CWRMA to remain in effect for a minimum of ten years, and thereafter unless either party should terminate it on two years' notice.  (Stip. ¶ 121; Exh. 438_00016.)

### ii.   Fallbrook PUD

51.   Fallbrook PUD owns approximately 1,400 acres along the SMR, with an unexercised riparian water right appurtenant to this 1,400 acres of property.  (Stip. ¶ 103.)  This riparian right was recognized by the District Court in the Fallbrook Case, in Interlocutory Judgment No. 39.  (Interlocutory Judgment No. 39, *United States v. Fallbrook Pub. Util. Dist.*, No. 51-1247-SD-C (S.D. Cal. Dec. 11, 1962)[5].)  A portion of this land was originally acquired as a proposed reservoir and dam site.  (Stip. ¶ 114; *see* 151 Cal. App. 2d at 85 (eminent domain action).)

52.   A portion of Fallbrook PUD's 1,400 acres of riparian property is currently leased to an agricultural grower that is serviced by Fallbrook PUD's municipal water supply system.  (Lewinger Tr. Day 5 at 1109:17-23.)

53.   Although Fallbrook PUD is not currently diverting and has not historically diverted SMR water for riparian use, Fallbrook PUD maintains a riparian right under California law to divert water from the SMR for use on its 1,400 riparian acres.  (Stip. ¶ 115.)

54.   Fallbrook PUD has Permit No. 11356 (Application No. 12178), which authorizes diversion to storage of up to 10,000 AFY from Tucolata Creek to Skinner Lake.  (Stip. ¶ 103; Exhs. 68, 69.)

---

[5] The Court hereby takes judicial notice of Interlocutory Judgment No. 39.

55.     For decades, Fallbrook PUD has sought additional water storage capacity and a supplemental source of water supply, including considering construction of an on-stream dam on the SMR.  (Stip. ¶ 20; *see generally* 151 Cal. App. 2d 84.)

56.     Fallbrook PUD applied for and obtained two permits to appropriate SMR water, which are held by the Bureau of Reclamation in trust for Fallbrook PUD.  Neither of these permitted rights has yet vested, and licenses have not yet been issued:

    a.     Permit No. 8511, issued April 23, 1951, authorizes diversion to storage of up to 10,000 AFY from the SMR and has a priority date of October 11, 1946.  (Stip. ¶ 103; Exh. 67; Exhs. 1738_00002; 1763.)  This permit, and its priority date, were recognized by the District Court in the Fallbrook Case, in Interlocutory Judgment No. 23.  (Exh. 1738.)

    b.     Permit No. 11357, issued May 2, 1958, authorizes diversion to storage of up to 10,000 AFY from the SMR and has a priority date of November 28, 1947.  (Stip. ¶ 103; Exh. 1163; Exh. 1738_00004.)  This permit, and its priority date, were recognized by the District Court in the Fallbrook Case, in Interlocutory Judgment No. 23.  (Exh. 1738.)

57.     Presently, Fallbrook PUD does not take any water from the SMR downstream from the Gorge.  Fallbrook PUD has not diverted any water from the SMR since 1969. (Stip. ¶¶ 109-10.)

### iii.     Camp Pendleton and Fallbrook PUD Joint Projects[6]

58.     In 1968, Fallbrook PUD and Camp Pendleton entered into a Memorandum of Understanding ("MOU") to use Fallbrook PUD's and Camp Pendleton's Permits 8511,

---

[6] A discussion of the parties' longstanding efforts to construct one or more dams on the SMR is relevant here because, until they have completed a project enabling them to capture the flows to which their permits entitle them, the appropriative rights protected by those permits have not become final.  Thus, this section sketches a brief overview of Plaintiffs' attempts to protect the appropriative rights reflected in the permits discussed in the two preceding sections.

11356, 11357, and 15000 as part of a joint water storage project. (Exh. 1168.)  The
MOU was an explicit attempt to settle the differences remaining after entry of the 1966
Judgment. (Exh. 1168.)  In the MOU, they agreed to follow the federal Bureau of
Reclamation's recommendation to build two dams on the lower SMR, creating the
DeLuz Reservoir and the Fallbrook Reservoir. (Exh. 1168_00005.)  Subject to certain
conditions, they agreed to allocate water from the project, 60 percent to the United States
and 40 percent to Fallbrook PUD. (Exh. 1168_00008.)  This MOU project became
known as the Two-Dam Project or the Santa Margarita River Project. (Stip. ¶ 130.)  The
MOU was approved by the Southern District, and incorporated into the 1966 Judgment
in 1968. (Exh. 1168.)

59.     In 1973, when Permits 8511, 11356, 11357, and 15000 came up for an extension,
State Board staff recommended that Fallbrook PUD's permits 8511, 11356, and 11357
be revoked, and that a license for 4,000 AFY be issued for the underground storage
portion of Camp Pendleton's Permit 15000.  The State Board rejected the staff's
recommendation to revoke Fallbrook PUD's Permits 8511, 11356, and 11357 on the
condition that the permits and the surface water storage component of Camp Pendleton's
Permit 15000 be assigned to the Bureau of Reclamation.  In so doing, the State Board
found that Camp Pendleton's and Fallbrook PUD's then-present plans anticipated that
the Two-Dam Project would be "designed, constructed and operated by the Bureau."  In
Order No. WR 73-50, the State Board concluded that since the "project will be
constructed and operated by the Bureau and the present permittees [plaintiffs] will have
little or no control over project construction and operation, the permits should stand in
the name of the Bureau, insofar as the surface water storage facilities are concerned."
(Stip. ¶ 131; Exh. 235_00002.)  Subsequently:

a.     In 1974, Permits 8511, 11357, and 15000 were assigned to the Bureau of
Reclamation for the benefit of Fallbrook PUD and Camp Pendleton.  The
Bureau now holds these permits in trust for Fallbrook PUD and Camp
Pendleton. (Stip. ¶ 105; Exh. 494_00003.)

    b.    In 1974, Permit 11356 was also assigned to the Bureau of Reclamation for the benefit of Fallbrook PUD and Camp Pendleton.  In 2001, this permit was reassigned back to Fallbrook PUD from the Bureau and amended to move the authorized point of diversion upstream to Lake Skinner, a reservoir owned by the MWD.  The permit no longer authorizes diversion or storage of SMR water downstream of the Gorge.  (Stip. ¶ 122; Exhs. 485, 486, 487, 488, 489, Lewinger Tr. Day 5 at 1060:1-1061:14.)

    c.    The development periods for Permits 8511, 11357, and 15000 have been extended several times, including in 1976, 1983, and 1998.  In its 1996 petition for an extension of time for these permits, the Bureau of Reclamation requested an additional 15 years.  In 1998, the State Board approved an extension until December 31, 2008.  At the time of trial, the Bureau of Reclamation, Camp Pendleton and Fallbrook PUD planned to petition the State Board to extend this deadline.  (Stip. ¶ 106; *see also* Exhs. 482, 483, 484, 494, 1164, 1165, 1169, 1171, 1172, 1187, 1188, 1759 and 1760.)

    d.    To date, no water from the SMR has been diverted or stored pursuant to Permits 8511 or 11357.  No water from the SMR has been diverted or stored pursuant to Permit 15000 in the form currently held by the Bureau of Reclamation.  (Stip. ¶ 107.)

60.    Congressional approval was required to proceed with the Two-Dam Project.  (Exh. 1168_00002.)  However, due in part to the number of major environmental laws enacted within a few years of the 1968 MOU (*i.e.*, the National Environmental Policy Act ("NEPA"), the Clean Water Act, the Endangered Species Act), the Project was never authorized.  (Exh. 482_00008.)  Thus:

    a.    Numerous efforts were made by Camp Pendleton and Fallbrook PUD to gain congressional authorization for the Two-Dam Project.  These efforts included H.R. 13299 in 1972; H.R. 3023 in 1973; H.R. 6014 in 1979; H.R.

1527 in 1981; S. 2684 in 1982; H.R. 1581 in 1983; and S. 805 in 1983. None of these bills were passed by both the House and Senate. (Stip. ¶ 123.)

b.   In 1988, a study prepared for Camp Pendleton by Leedshill-Herkenhoff, Inc. (the "Leedshill-Herkenhoff Study") determined the Two-Dam Project was no longer the federally-preferred alternative, and this Project was no longer pursued. (Stip. ¶ 124; Exh. 813.)

c.   The Bureau of Reclamation stated, in its 1996 petition requesting an extension of time, that the "[t]wo major dams are no longer appropriate or necessary to achieve the water supply benefits intended by the permits." According to the Bureau's recent progress reports to the State Board regarding the permits held on behalf of Camp Pendleton and Fallbrook PUD, "[i]t was concluded that a two-dam Santa Margarita project was no longer a feasible solution to water supply." (Stip. ¶ 134; Exhs. 482; 494.)

61.   In September 1990, with plans for the Two-Dam Project stalled, but negotiations for the Four Party Agreement proceeding, Camp Pendleton and Fallbrook PUD entered into a "Conjunctive Use Agreement" ("1990 CUA"). (Exh. 40.) The 1990 CUA noted that Fallbrook PUD still lacked "a facility to capture and store water flowing down the Santa Margarita River and must rely entirely on imported water," and that Camp Pendleton lacked "a means for delivery of imported water to Camp Pendleton." (Exh. 40_00001.) Further, the 1990 CUA acknowledged that "urban growth in the Upper Basin is fast reaching the point where the volume of effluent discharged from wastewater treatment facilities is no longer capable of being disposed of via irrigations and percolation and will require removal from the upper basin by pipeline or discharge to the Santa Margarita River," and that Eastern and Rancho, as upstream operators of wastewater treatment facilities, desired to dispose of treated wastewater through "Live

Stream Discharge" into the SMR.[7]  (Exh. 40_00002.)  While Camp Pendleton and Fallbrook PUD desired to retain this treated wastewater, DHS would not allow "even the most highly treated reclaimed water to discharge into a surface reservoir intended to store water for eventual use as a public drinking water supply."  (Exh. 40_00002-03.)  In light of the foregoing,

    a.    Fallbrook PUD agreed to defer its plan to construct a dam on the SMR to store water for potable use in order to allow Live Stream Discharge;

    b.    Camp Pendleton, Fallbrook PUD, Eastern and Rancho agreed to enter the Four Party Agreement for Live Stream Discharge, to include the construction of a reverse osmosis plant at Camp Pendleton for treatment of water extracted from the underground aquifer system;

    c.    the 1990 CUA provided for the building of a two-way pipeline between Camp Pendleton and Fallbrook PUD.  (Stip. ¶ 125; Exh. 40_00004.)

    d.    the 1990 CUA also provided that Camp Pendleton would allow Fallbrook PUD to store up to 6,000 acre-feet of water in an on-base, underground aquifer.  (Exh. 40_00004.)

    e.    the 1990 CUA entitled Fallbrook PUD to half the flows from the Four Party Agreement, up to a maximum of 6,000 AFY.  (Stip. ¶ 125.)

62.    However, the pipeline was never constructed, and the 1990 CUA no longer appears to be the preferred alternative:

    a.    At the direction of Congress, the Bureau of Reclamation is now preparing a feasibility study and draft environmental documents on a proposal for a new and different Conjunctive Use Project ("Proposed New CUP"), under which Fallbrook PUD and Camp Pendleton would divert and store water from the

---

[7] "Live Stream Discharge" generally refers to the direct release of treated wastewater into flowing surface waters, where it immediately becomes part of the water supply, rather than release to percolation ponds or irrigation sites from which the treated wastewater would return more gradually to the water supply.

SMR pursuant to Fallbrook PUD's Permit Nos. 8511 and 11357, and Camp Pendleton's Permit No. 15000. At the time of trial, the Bureau's feasibility study had not yet been completed or released for public comment. (Stip. ¶¶ 125, 133.)

    b.    The Proposed New CUP, as it is now contemplated, will require analysis under NEPA, and completion of the California Environmental Quality Act ("CEQA") process, and may require the approval of Congress. The Proposed New CUP may require the appropriation of federal funds, or may be funded through other sources. A bill providing authorization for the Proposed New CUP, H.R. 29, passed the House of Representatives, 110th Congress, on February 12, 2008, but at the time of trial had not yet passed the Senate. (Stip. ¶ 126; Lewinger Tr. Day 5 at 1065:4-1067:18; Exh. 1780.)

    c.    Planning and congressional approval for some form of Conjunctive Use Project has been under way for years, and Plaintiffs have spent millions of dollars in developing the project. (Stip. ¶¶ 125-126; Exh. 482_00010; Tinker Tr. Day 4 at 669:15-670:19, 741:11-742:2; and McPherson Tr. Day 5 at 917:23-919:12; 996:7-15.)

    d.    In its 2005 Progress Report, the Bureau of Reclamation estimated the date of completion of the preferred diversion/storage project contemplated under the Proposed New CUP to be December 2018. (Stip. ¶ 135.)

**C.    Defendants' Water Rights to Native SMR Water**

    **i.    Rancho**

63.    The parties have agreed that Rancho is a successor-in-interest to the Vail interests. (Stip. ¶ 118; Lemons Tr. Day 10 at 2319:12-20.) As such, Rancho has riparian rights to native SMR water that are the subject of the 1940 Stipulated Judgment. (Exh. 1765; 347 F.2d at 58.)

64.    Rancho has an appropriative right as described in Application No. 11518 and

Permit No. 7032, with a priority date of August 16, 1946, to store up to 40,000 AFY for groundwater recharge, and for irrigation and domestic uses within the watershed. (Exhs. 1865_03826-28; 813_00073.) This water is stored in Vail Lake (also known as Vail Reservoir), created when Vail Dam was built in 1948 to impound flood waters from Temecula Creek. (193 F. Supp. at 364.) The court in the Fallbrook Case recognized Permit No. 7032 in Interlocutory Judgment No. 35. (Findings of Fact, Conclusions of Law, and Interlocutory Judgment No. 35 (Vail Company), *United States v. Fallbrook Pub. Util. Dist.*, No. 51-1247-SD-C (S.D. Cal. May 8, 1962).[8])

65.    According to the annual reports of the Watermaster in the Fallbrook Case, Rancho produces groundwater under a variety of rights, including: (1) recovery of water appropriated at Vail Lake; (2) recovery of import return flows and recharged imported water; (3) groundwater appropriative rights; and (4) as agent on behalf of overlying landowners. (Exh. 1865_03826.) Before trial, Plaintiffs asserted that evidence would be presented that Rancho's groundwater pumping rights were not initiated until 1965 or 1968. However, no such evidence was offered at trial, or when the Court requested supplemental briefing on this issue after trial. As it stands, the Court can make no findings as to the priority of any groundwater rights held by Rancho or exercised by Rancho on behalf of its customers.

66.    That said, there is no evidence in the record that Rancho has an appropriative right to extract any native SMR water from either surface flows or groundwater for direct export to any other watershed.

        **ii.    Eastern**

67.    Eastern has not pumped native groundwater from the SMR watershed since 2002. (Stip. ¶ 138.) Eastern is not exercising any appropriative water rights within the SMR watershed. (Stip. ¶ 140.) Since 2002, Eastern has not produced or provided any water to its potable water customers that is native to the SMR watershed. (Stip. ¶¶ 138-139; Exh.

---

[8] The Court hereby takes judicial notice of Interlocutory Judgment No. 35.

1865_03877 (Watermaster Report WY 05-06 at table B-1).)

68.   Eastern does not claim an appropriative right to extract any native SMR water from either surface flows or groundwater for direct export to any other watershed.

## IV.   DEFENDANTS' WATER IMPORTING AND EXPORTING ACTIVITIES

69.   Since 1992, Eastern has imported water into the SMR watershed from other watersheds by contract with the MWD.  Some of this imported water is delivered to its own customers, and some is sold to Rancho.  (Exh. 1865_03877, 03884 (Watermaster Report WY 05-06 at Tables B-1 and B-8).)

70.   Rancho purchases water imported by Eastern to supplement its native SMR watershed supplies, delivering some of the imported water to its customers directly and percolating the rest into the Upper Basin for later recovery by pumping.  (Exh. 1865 at 03825-3834 (Watermaster Report WY 05-06 at 57–67); Lemons Tr. Day 10 at 2317:10-17.)

71.   After these supplies of native and imported water have been delivered to Rancho's water service customers for beneficial use, Rancho and Eastern both receive and treat the resulting native/imported wastewater:  Eastern at its Temecula Plant and Rancho at its Santa Rosa Plant.  (Stip. ¶¶ 6, 10; Exh. 644_00010; Shahroody Tr. Day 2 at 248:23-251:1.)

72.   In 1990, Eastern and Rancho operated wastewater treatment plants in the SMR watershed that produced about 4.0 million gallons per day ("MGD") of reclaimed wastewater.  Defendants disposed of this reclaimed wastewater by recharging the groundwater at the Pauba Ponds, and by selling the treated wastewater for irrigation purposes within the SMR watershed.  Thus, until approximately December 1992, Defendants kept all of their treated wastewater within the SMR watershed, percolating it into the Upper Basin through local reclamation and percolation projects.  (Stip. ¶ 59; Exhs. 1383_0001-0005; 172_00017; 313_0005; 49_00002; Plummer Tr. Day 10 at 2284:20-2285:9; Shahroody Tr. Day 1 at 158:11-159:24; Schlange Tr. Day 8 at 1739:2-1740:10.)

73.     Once the return flow from this treated wastewater percolated into the Upper Basin, it eventually contributed to flows in the SMR either by displacing tributary surface flow that would otherwise have percolated into the Upper Basin or by rising in the SMR at the Gorge. (Shahroody Tr. Day 1 at 115:15-117:15, 129:4-132:23; Day 2 at 248:3-22.)

74.     Presently, both Eastern and Rancho export treated wastewater, a portion of which derives from native SMR water, out of the SMR watershed. (Shahroody Tr. Day 2 at 248:24-251:8.)

75.     Between 1990 and 2006, Eastern and Rancho undertook plant expansions that more than quadrupled their production of reclaimed water, from less than 4.0 MGD to more than 16.0 MGD. (Shahroody Tr. Day 1 at 143:16-144:2.)

76.     Since December 1992, Eastern has exported native water out of the SMR watershed into the Santa Ana River watershed through the Winchester Pipeline, which has a nominal capacity of 10.0 MGD.[9]  (Stip. ¶ 58; Exh. 1865_03803; Exh. 644_00013; Bachmann Tr. Day 13 at 2991:22-23.)

77.     Recently, Defendants have also greatly increased their export capacity. (Stip. ¶ 97; Exh. 1865_03806; Exh. 1564_00124-125.)  Between 2003 and 2004, Eastern quadrupled the capacity of the Temecula Plant to export treated wastewater by constructing and beginning to utilize the new Palomar Pipeline, with a capacity in excess of 32 MGD, in addition to the existing 10.0 MGD capacity of the Winchester Pipeline. (Stip. ¶ 97; Exh. 348; Exh. 644 at 2-13; Bachmann Tr. Day 13 at 3005:10-3006:2.)

78.     Soon after the Palomar Pipeline came online on November 16, 2004, Eastern began exporting treated wastewater containing native SMR water through that pipeline to the Santa Ana River watershed. (*See* Stip. ¶ 97; Exh. 1865 at 03806; Exh. 1564 at

---

[9] There is conflicting evidence as to whether the Winchester Pipeline extends to the Santa Ana River or San Jacinto Watershed. (*Compare* Stip. ¶ 58 and Bachmann Tr. Day 13 at 2991:22-23 with Exh. 644_00013.)  However, there is no dispute that the Winchester Pipeline is used to export treated water out of the SMR watershed.

00124-125.)

79.     Rancho began exporting water out of the SMR watershed in 2005 (Exh. 1865_03806).  By contract with Eastern, Rancho has utilized the Palomar Pipeline to export treated wastewater containing native SMR water out of the SMR watershed on two occasions.  (Lemons Tr. Day 10 2339:23-2340:21).

80.     While the parties dispute whether approval was needed, it is undisputed that neither Eastern nor Rancho sought or obtained the approval of the Regional Board to export treated native SMR water out of the SMR watershed pursuant to Cal. Water Code § 1211.

81.     Rancho's pumping of native water to service customers in the Upper Basin, and Eastern's provision of such waters through 2002, have contributed to a reduction of natural flow to the SMR through the Gorge to the Lower Basin:

    a.      Rancho's major area of groundwater production is in the Pauba Valley, where there are two groundwater aquifers.  The first is a confined deep aquifer known as the Temecula formation, which is overlain by an unconfined aquifer known as the Pauba Murrieta formation.  In recent years, Rancho has produced nearly 25,000 to 30,000 AFY from these two aquifers.  (Shahroody Tr. Day 1 at 127:24-128:19; 138:3-6; Exh. 1564_00123.)  Prior to 2003, Eastern pumped as much as 630 AFY from SMR groundwater aquifers.  (Exh. 1564_00123.)

    b.      Temecula Creek overlies these aquifers.  Historically, a significant portion of Temecula Creek had contact with the groundwater aquifer.  This contact allowed groundwater from the aquifer to discharge to Temecula Creek as it made its way to the Gorge.  Groundwater pumping has reduced the storage of water in the aquifer causing the water table in the unconfined aquifer to lose contact with the streambed.  This is known as "dewatering."  Since 1935, there has been increased groundwater pumping in response to tremendous population growth.  As a result, a substantial portion of

Temecula Creek has become dewatered.  In the areas that have become dewatered, groundwater "base flow" no longer discharges to Temecula Creek.  By 1998, most of the Temecula Creek streambed had lost contact with the aquifer.  (Shahroody Tr. Day 1 at 129:4-132:23; 137:1-138:6.)

c.   Base flow contributions have continued to decrease as the population in the Upper Basin has grown.  Since the mid-1980s, natural, non-augmented stream flows at the Gorge have decreased dramatically and, since the mid-1990s, have been non-existent during some months of the year.  Water releases made immediately upstream from the United States Geological Survey ("USGS") measuring gauge pursuant to the 1940 Stipulated Judgment (starting in 1989), and the CWRMA (beginning in 2002) have led to an upward trend in stream flow measurements at the Gorge.  (Shahroody Tr. Day 1 at 133:1-136:7.)

d.   Retention of treated water return flows in the SMR watershed would replenish groundwater supplies and result in increased downstream flows.  (Shahroody Tr. Day 2 at 248:7-22.)

82.   Camp Pendleton's groundwater aquifers have supplied sufficient quantities of water to meet Camp Pendleton's needs.  (Storey Tr. Day 1 at 85:6-18; Williams Tr. Day 13 at 3070:24-3071:17.)  However, in order to maintain existing water levels in its groundwater aquifers, Camp Pendleton has been required to cut back on its pumping to avoid groundwater aquifer compaction and seawater intrusion.  (T. Johnson Tr. Day 14 at 3189:12-3190:14; 3218:10-3219:21.)  Further, according to the Leedshill-Herkenhoff Study completed in 1988, Camp Pendleton's water needs were projected to increase from the 7,037 AF pumped in 1986 to approximately 13,780 AFY by 2010, with an additional 5,900 AFY necessary in the event of full military mobilization.  (McPherson Tr. Day 4 at 857:4-859:3.)

83.   Rancho is currently "banking" 5,000 AF of make-up water pursuant to the CWRMA, which it is prepared to release to Camp Pendleton upon request.  (Carlson Tr.

Day 3 at 597:17-598:5; Lemons Tr. Day 10 at 2326:24-2327:13.)

84.    As the population in the Upper Basin has grown, Camp Pendleton has experienced degradation in the quality of water contained in the wells that supply potable water to the Base.  The principal problem has been an increase in the concentration of salts, measured as TDS, in Camp Pendleton's wells.  (Shahroody Tr. Day 1 at 165:20-166:13.)

85.    Defendants' activities in the Upper Basin, including the import and distribution of MWD water and reclaimed water, have contributed to a significant increase in the volume of salt, or TDS, in the Upper Basin, and have increased the volume of salt passing through the Gorge:

   a.    Eastern and Rancho have imported increasing amounts of water from the MWD to service the growing population in the Upper Basin.  Total water imports have expanded from over 30,000 AF in 1991 to over 74,000 AF in 2006.  Imported MWD water contains salt in average concentrations of 500 mg/L.  Most of the salt imported with MWD water stays in the SMR watershed.  (Shahroody Tr. Day 1 at 201:4-202:9; Day 15 at 3557:1-3558:15, 3561:10-3569:10.)

   b.    During the sixteen-year period from 1991 through 2006, Eastern and Rancho imported more than 468,000 tons of salt into the Upper Basin.  In addition, 13,000 tons of salt loading occurred from Eastern's and Rancho's reclaimed reuse and recharge within the basin.  Eastern and Rancho exported 74,000 tons of salt from the basin as a result of taking treated reclaimed water to the Santa Ana River watershed.  These exports account for only 15 percent of the total salts imported into the basin.  The remaining 85 percent of imported salt remains in the SMR watershed.   (Shahroody Tr. Day 2 at 225:19-227:4.)

86.    Following population growth in Defendants' service areas, Upper Basin tributaries to the SMR have also become degraded by nutrients and salt:

   a.    By 2002, Murrieta Creek in the Upper Basin and the upper SMR were both

listed under Section 303(d) of the Clean Water Act as impaired for phosphorus. (Welch Tr. Day 12 at 2708:23-2727:3; Exh. 362_00005; Exhs. 76_00013; 192_00004; 1789_00002-03.) TDS was also identified as a "Constituent of Potential Concern" for Murrieta Creek. (Exh. 192_00004.)

b.   By 2006, Murrieta Creek's 303(d) listing was amended to include nitrogen. (Exh. 1790_00010-11.) Further, Temecula Creek in the Upper Basin was listed as impaired under Section 303(d) for nitrogen, phosphorus and TDS. (Orton Tr. Day 15 at 3437:19-3438:7; Exh. 1790_00024-25.)

c.   Population growth can contribute to water quality impairment and lead to 303(d) listings. (Theisen Tr. Day 6 at 1269:16-20.)

87.   Degradation in Lower Basin groundwater aquifers is demonstrated by a dramatic increase in TDS concentrations at two wells (T1S/R4W-7A2 ("7A2") and T1S/R4W-7H2 ("7H2")) in the Upper Ysidora Sub-basin on Camp Pendleton. These two wells are: (1) hydraulically upstream of all historical wastewater releases by the Base; (2) closely connected to the surface water stream; and (3) located closer to the upstream source of Camp Pendleton's supply than any other wells. (Williams Tr. Day 13 at 3053:16-20; Shahroody Tr. Day 2 at 234:4-21; 297:12-298:5, Day 15 at 3580:22-3583:15; 3582:22-3584:12.)

88.   Prior to intensive development in the Upper Basin, TDS concentrations in 7A2 and 7H2 averaged approximately 650 mg/L. (Exh. 337_00249-50.) From 1989-2002, TDS concentrations averaged 730 mg/L, and from 2003-2006 TDS concentrations averaged 770-780 mg/L. (S. Johnson Tr. Day 10 at 2152:16-2154:24; Shahroody Tr. Day 2 at 234:25-236:5.)

89.   Lower Basin activities have also contributed TDS to the Lower Basin, including to wells 7A2 and 7H2. Since the 1960s, Camp Pendleton has been concerned about agriculture and other non-point sources polluting Rainbow Creek and Fallbrook Creek, which are tributaries to the SMR in the Upper Ysidora Sub-basin. (Carlson Tr. Day 3 at 559:2-562:1.)

90.     However, Upper Basin growth and activities are the primary source of increased TDS in wells 7A2 and 7H2. (Shahroody Tr. Day 15 at 3576:22-3577:4; 3584:13-3585:13; T. Johnson Tr. Day 14 at 3158:21-3165:25.) The volume of salt contributed by Lower Basin activities represents only a small fraction of the total salt added to the SMR in the Upper Ysidora section of the Lower Basin. (*See* Shahroody Tr. Day 15 at 3576:22-3577:4; 3584:13-3585:13.)

91.     Neither Plaintiffs' nor Defendants' experts performed a salt loading or salt balancing analysis on the Lower Basin. (*See* Williams Tr. Day 13 at 3097:16-22; Shahroody Tr. Day 2 at 283:1-4, 295:18-296:7; Shahroody Tr. Day 15 at 3585:23-3587:9, 3589:24-3590:3.) Further, none of the experts performed a thorough study of hydrology and rainfall, which would be required to relate water and wastewater management practices in the Upper Basin with changes in groundwater quality on Camp Pendleton. (Shahroody Tr. Day 15 at 3588:14-3589:23.) Thus, while the evidence establishes that Defendants' Upper Basin activities are contributing to degradation of Camp Pendleton's groundwater, the precise amount of degradation attributable to Defendants' activities was not established by the evidence presented at trial.

92.     Native water (*i.e.*, water produced as surface and groundwater within the basin of the SMR watershed) is of better quality than imported MWD water.  SMR surface flow can have TDS levels as low as 200 to 250 mg/L.  TDS levels in groundwater from SMR aquifers range from 270 to 450 mg/L.  As a result, reclaimed water that originated as native water is of higher quality than reclaimed water from imported water sources. (Shahroody Tr. Day 2 at 241:5-246:8.)

93.     Discharge of reclaimed water, with TDS levels of approximately 750 mg/L, through the Gorge would have diluting effects on downstream SMR flows where such flows have TDS concentrations higher than 750 mg/L. (Shahroody Tr. Day 2 at 301:16-302:9.)

94.     With the addition of CWRMA flows in 2002, TDS concentrations at the Gorge have averaged less than 700 mg/L. (Williams Tr. Day 13 at 3061:5-3062:19; 3069:24-

3070:21.)

95.    No evidence was presented that Defendants' export of treated water is causing or contributing to increased TDS levels in Camp Pendleton's groundwater aquifers. However, several experts, including Mr. Shahroody, testified that keeping reclaimed water in the watershed would dilute the increased TDS resulting from Defendants' activities and result in a net benefit to the quality of groundwater in the Lower Basin. (*See, e.g.*, Shahroody Tr. Day 2 at 301:16-302:9.)

## V.    THE FOUR PARTY AGREEMENT

96.    On September 21, 1990, the United States, Fallbrook PUD, Rancho and Eastern entered into the "Agreement for Live Stream Discharge to the Santa Margarita River" ("Four Party Agreement" or "FPA").  (Exh. 49; Stip. ¶ 32; *see supra*, Findings of Fact ¶ 44.)  This is the agreement that Plaintiffs now claim was breached by Defendants; therefore, the facts surrounding its negotiation and implementation are discussed in detail.

### A.    Events Leading to the Four Party Negotiations

97.    Since at least 1980, the population in the Upper Basin has experienced rapid growth.  As a result, the Eastern and Rancho service areas have seen a large growth in the number of water users, and Eastern and Rancho have seen an increase in the amount of wastewater they are responsible for treating.  (Stip. ¶ 16; Schlange Tr. Day 8 at 1737:12-19.)

98.    By the mid-1980s, Eastern was running out of capacity for disposal of treated wastewater and faced the possibility of adverse civil and administrative enforcement actions for unpermitted discharges, as well as a construction ban imposed by a sewer moratorium on additional hookups, which would essentially shut down development in the Upper Basin. (Stip. ¶¶ 17, 19; Exhs. 134; 797_00004-6, 798, 800, 1382; 1701; 811_00004; Plummer Tr. Day 10 at 2225:13-2226:18, 2227:12-2228:10, 2286:15-2287:17; Schlange Tr. Day 8 at 1735:18-1736:4, 1737:12-1740:16, 1740:24-1741:6; Hennigar Tr. Day 8 at 1827:17-1828:4; Lemons Tr. Day 11 at 2459:16-2460:7; Carlson

Tr. Day 2 at 347:2-348:17.)

99.    Prior to December 1989 when Rancho's treatment plant went online, Rancho was dependant upon Eastern for the treatment of all but a small portion of the wastewater generated in its service area. (Exhs. 31_00009; Lemons Tr. Day 11 at 2457:3-19, 2459:12-2460:7; Hennigar Tr. Day 8 at 1826:5-1826:24.)

100.    Because new building permits in Rancho's service area could not be issued unless builders could show sewer rights, Eastern's disposal capacity issues had a direct effect on Rancho. (Hennigar Tr. Day 8 at 1827:17-1828:4; Lemons Tr. Day 11 at 2459:16-2460:7.)

101.    Since at least 1986, Camp Pendleton has objected to water quality degradation in the SMR watershed. (Stip. ¶ 19; Exhs. 49_00002; 815; 811; Carlson Tr. Day 2 at 369:1-9.)

102.    As of 1987, there were nine operational wastewater treatment plants located at Camp Pendleton.  At that time, three wastewater treatment plants were located in the SMR watershed, and discharged to locations inside the watershed.  Six wastewater treatment plants were located outside the SMR watershed, two of which discharged to locations both inside and outside the SMR watershed. (Stip. ¶ 21.)

103.    On August 6, 1987, Rancho applied for waste discharge limits for its new 5.0 MGD Santa Rosa Plant. (Stip. ¶ 22.)

104.    Also in 1987, Eastern started the process to expand its Temecula Plant to increase its capacity to treat wastewater, in response to the increase in wastewater due to rapid development. (Plummer Tr. Day 10 at 2225:13-22 and 2287:18-2292:14; Schlange Tr. Day 8 at 1735:18-1736:4; Exhs. 31_00011-13 (Section VIII); 506_00001.)

105.    At this time, Camp Pendleton again raised concerns about SMR water quality, particularly the effect of Eastern's proposed Temecula Plant expansion on Camp Pendleton's drinking water supply. (Exhs. 811; 321; 815; 542_00002; Carlson Tr. Day 2 at 369:1-9.)

106.    In an effort to address Camp Pendleton's concerns, on October 27, 1988, Eastern

entered into a Memorandum of Agreement ("MOA") with Camp Pendleton whereby Eastern agreed to construct gauging stations and monitor water quality. (Plummer Tr. Day 10 at 2293:22-2294:12; Exh. 1285_00005-06; 1383_00005; *see also* Exhs. 323; 811; 815.) Pursuant to the MOA, Eastern also agreed not to export its wastewater discharge out of the SMR watershed, subject "only to environmental constraints or legal constraints, the mitigation of or compliance with which are beyond the control of Eastern." (Exh. 1285_00004.)

107.   On November 21, 1988, the Regional Board issued waste discharge requirements for Eastern's Temecula Plant expansion in Board Order No. 88-94. (Stip. ¶ 23; Exh. 1383.) The MOA between Eastern and Camp Pendleton was incorporated into this order. (Exh. 1383.) Order No. 88-94 also:

a.   acknowledged that Eastern's existing treated wastewater disposal was governed by Order No. 86-67, as amended by Addendum No. 1, which allowed the discharge of up to 2.0 MGD by spray irrigation at a local sod farm, and by percolation at the east Pauba Valley pond site; and that Eastern was requesting an increase from 2.0 MGD to 5.0 MGD, with the addition of new percolation beds. (Exh. 1383_00001.)

b.   indicated that Eastern's proposal to discharge treated wastewater with a TDS concentration of 750 mg/L would exceed the Basin Plan's groundwater objective of 500 mg/L for TDS. (Exh. 1383_00006 at ¶ 20).)

c.   imposed a limit of 3.0 MGD for the discharge of treated wastewater, but allowed discharge at the new percolation ponds in the west Pauba Valley, and at an additional irrigation site; TDS levels for treated wastewater discharged to the Pauba ponds were limited to a daily maximum of 600 mg/L, with a 30-day average limit of 500 mg/L. (Exh. 1383_00013.)

d.   stated that Eastern's discharge to its Pauba Valley percolation sites was projected to be a "short term project to be implemented for approximately three years." (Exh. 1383_00006 at ¶ 20; Carlson Tr. Day 2 at 350:14-

352:16, 353:17-23, 354:18-355:2.)

    e.    recognized that Eastern proposed to implement a Live Stream Discharge to the SMR by 1992. (Exh. 1383_00006 at ¶ 20.)

108.    To ensure compliance with the Basin Plan, the Regional Board also issued a Time Schedule Order ("TSO"), Order No. 88-101, which required Eastern either to propose an amendment to the Basin Plan for the allowance of Live Stream Discharge, or to develop an approach for achieving compliance with the Basin Plan without Live Stream Discharge. (Stip. ¶ 24; Exh. 1383_00006 at ¶ 20.) TSO No. 88-101 was issued because Eastern's Temecula Plant threatened to violate the discharge specifications in Board Order No. 88-94 regarding TDS levels, and provided that Eastern was to achieve full compliance with all Basin Plan objectives by January 30, 1992. (Exh. 1701_00001-03.)

109.    By 1990, Eastern and Rancho operated wastewater treatment plants in Temecula that produced a total of approximately 4.0 MGD of reclaimed wastewater. At that time, the population growth in Rancho's and Eastern's service areas was expected to cause treatment plant production to increase to 45 MGD, a total in excess of the amount Rancho and Eastern could dispose of through sale or percolation in the Upper Basin. (Stip. ¶ 25.)

110.    In January 1990, Eastern approved construction of the Temecula Plant Pipeline Project. (Stip. ¶ 26.)

111.    Defendants were aware of Camp Pendleton's concerns that urban runoff and agricultural drainage from rapid upstream development would increase the TDS concentrations in the groundwater basin, further degrading its drinking water supply. These concerns were highlighted in the Leedshill-Herkenhoff Study, which set forth the need for Camp Pendleton to "actively protect United States water rights and water quality on the Santa Margarita River." (Exh. 813 *generally* and at 00025; Carlson Tr. Day 2 at 397:25-401:22; McPherson Tr. Day 4 at 766:12-23; 855:13-856:9 and 869:17-870:4; *see also* Exhs. 49_00002; 811).

112.    Eastern first approached Plaintiffs in or about 1987 with the concept of Live

Stream Discharge as a means of solving their disposal problems in the Upper Basin.
(Tinker Tr. Day 3 at 639:8-640:4; McPherson Tr. Day 4 at 778:4-779:1).  Eastern knew
that it needed Camp Pendleton's consent to increase or change the point of discharge in
the Upper Basin. (Exh. 208; Plummer Tr. Day 10 at 2292:15-2293:2.)  Eastern promoted
Live Stream Discharge as being in the interest of all parties. (Exh. 1702_00001.)

113.   Under the proposed Live Stream Discharge, Defendants would have obtained a
much needed "relief valve" for their excess treated wastewater. (Schlange Tr. Day 8 at
1772:16-1774:6 and 1774:21-1775:20.)

114.   In return, Plaintiffs would have received year-round augmentation flows of highly
treated wastewater that would provide additional water supplies and dilute the effects of
urban runoff caused by increased development in the Upper Basin. (Exh. 112; Carlson
Tr. Day 2 at 397:11-399:6; 399:23-401:22; McPherson Tr. Day 4 at 855:13-856:9,
869:17-870:4; see also Exh. 49_00003.)

115.   Plaintiffs also believed that Live Stream Discharge would facilitate settlement of
longstanding water rights disputes raised in the Fallbrook Case. (McPherson Tr. Day 4
at 786:5-9; Exhs. 40; 49_00010-12; 1752.)  Specifically, Plaintiffs anticipated that
augmentation flows provided under the proposed Live Stream Discharge project could
be used in connection with the joint water diversion and storage project that was being
planned by the United States and Fallbrook PUD. (Exhs. 40; 49_00010-12; see also
Tinker Tr. Day 4 at 671:9-672:11.)  Accordingly, on September 12, 1990, Camp
Pendleton and Fallbrook PUD entered into the 1990 CUA. (Stip. ¶ 31; Exh. 40; see
supra, Findings of Fact ¶¶ 61-62.)

**B.**     **What the Parties Knew Prior to Executing the Four Party Agreement**

116.   Under the Clean Water Act, all wastewater discharges to surface waters require a
National Pollution Discharge Elimination System ("NPDES") permit.  The Regional
Board has been delegated authority to implement and enforce the Clean Water Act in its
region of California. (Theisen Tr. Day 6 at 1159:17-1160:8.)

117.   Prior to approaching Plaintiffs about Live Stream Discharge, Defendants knew

that the Regional Board would not permit Live Stream Discharge to the SMR unless the treated water met stringent requirements for nitrogen and phosphorus removal. Defendants also knew that the assimilative capacity for TDS would need to be established even if the treated effluent was to be put to a beneficial use such as irrigation. (Exh. 208_00002; Plummer Tr. Day 10 at 2290:23-2292:1.)

118.   By mid-1988, Eastern should have been aware that DHS might object to discharge of reclaimed water into the SMR, as it had already objected to similar discharge by Eastern into the Santa Ana River watershed:

    a.    In March 1988, DHS notified Eastern that it would oppose Eastern's proposed export of 45 MGD of reclaimed water from the SMR watershed for discharge in the Santa Ana River watershed, due to concerns about the effect on downstream groundwaters in the Santa Ana River watershed used as sources of domestic water supply.  (Exh. 807.)

    b.    The following month, DHS withdrew its "categorical opposition" to the Santa Ana River discharge provided that Eastern evaluate the effect the discharge would have on groundwaters and provide any necessary mitigation.  (Exh. 810.)

    c.    The record does not establish what steps Eastern may have taken to comply with these conditions, but it eventually began exporting treated wastewater to the Santa Ana River watershed, and has been doing so since 1992.  (Stip. ¶¶ 58, 97; *see supra*, Findings of Fact ¶ 76 n.9.)

119.   By 1989, the parties knew that DHS might take the position that draft guidelines prepared by its Office of Drinking Water applied to the contemplated Live Stream Discharge project.  (Tinker Tr. Day 4 at 675:13-679:12; Plummer Tr. Day 10 at 2289:23-2290:8, 2290:16-22; Exhs. 1272_00003; 807; 810; 208_00001.)

    a.    DHS has taken a public position on the use of reclaimed water to recharge the domestic water supply since before the first Basin Plan was adopted in 1975.  (*See supra*, Findings of Fact ¶ 13.)  Draft guidelines from DHS on

groundwater recharge and reuse projects (that is, formal projects designed to introduce reclaimed water into the groundwater supply) have been circulating since at least 1988. The most recent DHS draft guidelines are dated January 2007, but none of the draft guidelines have ever been adopted as regulations. (Trussell Tr. Day 14 at 3296:4-21.)

b. Around 1989-1990, the draft guidelines applied both to discharges into spreading basins that percolate into groundwater and to direct injection of reclaimed water into groundwater aquifers. The draft guidelines did not explicitly apply to discharges into rivers that flow into groundwater basins, such as the Live Stream Discharge contemplated by the Four Party Agreement. (Trussell Tr. Day 14 at 3297:12-3298:4; Jackson Tr. Day 16 at 3640:15-3641:25, 3643:1-3645:2; Exh. 222.) However, the June 1990 draft guidelines did provide that "not more than 50 percent of the water drawn at any domestic well shall be reclaimed water." (Exh. 1703_00015.)

c. At least some involved parties concluded that DHS would consider the guidelines in conducting the normal evaluation process for any proposed project. During a normal evaluation process, when DHS has concerns about a particular discharge, it typically requires the discharger to conduct studies on the impact of the discharge for a minimum of one year. An engineer then reviews the data and submits a report to DHS, which then determines whether the wastewater content can be increased. (Trussell Tr. Day 14 at 3298:5-3299:20; Jackson Tr. Day 16 at 3640:15-3641:25, 3643:1-3645:2.)

120. By 1990, the estuary at the downstream end of the SMR was designated as impaired under Section 303(d) of the Clean Water Act. (Welch Tr. Day 12 at 2737:25-2740:9; Oda Tr. Day 7 at 1447:3-5.)

a. When a water body is listed as impaired under Section 303(d) of the Clean Water Act, the state must establish total maximum daily loads ("TMDLs") for the pollutants causing the impairment. 33 U.S.C. § 1313(d). All water

bodies listed as impaired under Section 303(d) are required to go through the TMDL process until they are delisted; a water body would only be delisted if the TMDLs were successfully implemented and water quality standards achieved.  33 U.S.C. § 1313(d); *Friends of Pinto Creek v. EPA*, 504 F.3d 1007, 1011 (9th Cir. 2007); (Moore Tr. Day 12 at 2891:16-2892:2; 2893:6-14; Theisen Tr. Day 6 at 1162:21-1163:9.)

b.      A TMDL specifies the maximum amount of a particular pollutant that can be discharged or loaded into the waters from all sources without exceeding water quality objectives.  (40 C.F.R. § 130.2(i); *Pinto Creek*, 504 F.3d at 1011; Theisen Tr. Day 6 at 1162:21-1163:9.)

c.      Stringent limitations on point source discharges may become unnecessary if nonpoint source controls are effective in providing assimilative capacity for point source discharges.  40 C.F.R. § 130.2(g); *In the Matter of the Review on its Own Motion of Waste Discharge Requirements for the Avon Refinery*, State Water Resources Control Board, Order WQ 2001-06 at 13.

d.      A Section 303(d) listing alone is not a sufficient basis on which to conclude that a water body lacks assimilative capacity for an impairing pollutant. *In the Matter of the Review on its Own Motion of Waste Discharge Requirements for the Avon Refinery*, State Water Resources Control Board, Order WQ 2001-06 at 13.

121.   In contemplation of implementing a Live Stream Discharge program, the parties jointly commissioned, funded, and performed the "Water Quality Protection Study, Volumes I and II" dated July 1990 in support of Live Stream Discharge to the SMR.  The study provided an analysis of existing and future activities within the SMR basin that might affect groundwater quality within Camp Pendleton.  (Stip. ¶ 27; Exh. 112; Tinker Tr. Day 3 at 640:5-24.)

122.   The Water Quality Protection Study confirmed Camp Pendleton's concerns that its water supply was being degraded by the increase in urban runoff in the Upper Basin.

(Exh. 112; Theisen Tr. Day 6 at 1209:15-1210:15; *see also* Welch Tr. Day 12 at 2663:19-2664:14.)  The Water Quality Protection Study:

    a.    predicted that, without Live Stream Discharge, Camp Pendleton's groundwater quality was anticipated to degrade, with an expected increase in TDS of 200 mg/L (Welch Tr. Day 12 at 2761:13-23), and concluded that Live Stream Discharge would help to dilute non-point source contamination (Welch Tr. Day 12 at 2760:15-19).

    b.    confirmed that implementation of the Live Stream Discharge program required certain amendments to the Basin Plan. (Exh. 112.)   Specifically, it concluded that implementation of Live Stream Discharge required two main changes:  (1) maximum TDS levels set in the Basin Plan needed to be raised from 500 mg/L, and (2) limits for nitrogen and phosphorus in the Basin Plan needed to be set at levels that could feasibly be met without impairing the beneficial uses of the SMR.  (Exh. 112_00032.)

    c.    indicated that, although the Regional Board recognized the need to change Basin Plan objectives for the SMR to enable Live Stream Discharge, "the Board does not have sufficient staff resources to conduct the necessary studies upon which to base a recommended change."  The Board was only willing to consider amending the Basin Plan if (1) it was provided with "technical documentation supporting the change," and (2) "all upstream and downstream agencies which might be affected by the change concur in the recommendation." (Exh. 112_00032.)

    d.    observed that the proposed Live Stream Discharge would be subject to water reuse policies of DHS and that the "requirements for reclaimed water used to recharge groundwater basins used for potable water supplies are not [ ] well defined and will be evaluated on a case by case basis." (Exh. 112_00032-33.)

123.    Eastern, Rancho, Fallbrook PUD and Camp Pendleton all recognized that the

Basin Plan had to be amended in order to proceed with the proposed Live Stream Discharge, and agreed that the specific amendments required were for the allowable levels of TDS, nitrogen and phosphorus. (Stip. ¶ 30; Exhs. 49_00002-03; 802; 317; 136; Carlson Tr. Day 3 at 588:18-21; Theisen Tr. Day 6 at 1187:2-1188:16, 1190:18-1191:7; Plummer Tr. Day 10 at 2229:6-23 and 2252:4-12; Lemons Tr. Day 10 at 2352:19-22.) As noted above, the then-existing limit for TDS was 500 mg/L. (*Supra*, Findings of Fact ¶ 122(b).)  However, the limits on phosphorus and nitrogen were less clear:

    a.    The initial 1975 version of the San Diego Basin Plan contained a footnote stating that "[c]oncentrations of nitrogen and phosphorus, by themselves or in combination with other nutrients, shall be maintained at levels below those which stimulate algae and emergent plant growth.  Threshold total Phosphorus (P) concentrations shall not exceed 0.05 mg/l in any stream at the point where it enters any reservoir or lake, nor 0.025 mg/l in any reservoir or lake.  A desired goal in order to prevent plant nuisance in streams and other flowing waters appears to be 0.1 mg/l total P.  These values are not to be exceeded more than 10% of the time unless studies of the specific water body in question clearly show that water quality objective changes are permissible and changes are approved by the Regional Board. Analogous threshold values have not been set for nitrogen compounds; however, natural ratios of nitrogen to phosphorus are to be determined by surveillance and monitoring and upheld.  If data are lacking, a ratio of N:P = 10:1 shall be used."  This language is still found, almost verbatim, in the operative 1994 Basin Plan's water quality objectives. (Exhs. 1795_00053; 1814_00122-23; Theisen Tr. Day 6 at 1187:24-1190:5.)

    b.    In 1990, the Regional Board's position was that the nitrogen and phosphorus limits were "narrative objectives," rather than numeric water quality objectives; the EPA and the State Board took the opposite view. (Theisen Tr. Day 6 at 1187:24-1190:2.)  Over the years, Defendants have

1    taken the position that the numerical goals of 1.0 mg/L nitrogen and 0.1
2    mg/L phosphorus were not based upon any reliable scientific rationale, and
3    were designed to apply only in the event that no other standards were
4    demonstrated to be more appropriate for the SMR.  (Exhs. 337_00026-31;
5    278; Webster Tr. Day 11 at 2626:24-2627:11 *see also* Exh. 1124_00001-
6    03.)

7  124.  Prior to September 1990, members from the Regional Board staff participated in
8    meetings with the four parties regarding the proposed Live Stream Discharge project:

9        a.    During these discussions, Mr. Theisen of the Regional Board discussed the
10             need for the parties to conduct a demonstration project -- that is, a small
11             scale trial of Live Stream Discharge -- to determine the levels of nitrogen
12             and phosphorus that could be safely discharged without causing nuisance
13             algae blooms in the SMR.  A demonstration project was necessary because
14             the Regional Board did not have sufficient evidence and data to set effluent
15             limits that would protect beneficial uses.  Eastern and Rancho knew that an
16             NPDES permit would be required for this demonstration project to proceed.
17             (Theisen Tr. Day 6 at 1191:24-1193:16, 1196:18-1197:15, 1197:22-
18             1198:10; *see also* Exh. 208_00002.)

19       b.    Mr. Theisen identified, in discussions with Eastern and Rancho prior to the
20             execution of the FPA, a range of nutrient limits for phosphorus and nitrogen
21             that might be applied to Eastern and Rancho's Live Stream Discharge
22             permits.  The ranges were from 1.0 mg/L to 10.0 mg/L for nitrogen and 0.1
23             mg/L to 1.0 mg/L for phosphorus.  (Theisen Tr. Day 6 at 1201:3-1203:22.)
24             These ranges were consistent with the "projected effluent quality" of 2.0
25             mg/L total nitrogen and 1.0 mg/L total phosphorus set forth in Eastern's
26             April 1990 Draft Environmental Impact Report.  (Theisen Tr. Day 6 at
27             1206:24-1208:6; Exh. 1613_00186.)

28       c.    Mr. Theisen also discussed the issue of nutrient limits with the EPA.  The

43

EPA's position was that nitrogen limits should not exceed 10.0 mg/L and that phosphorus limits should not exceed 0.5 mg/L.  Mr. Theisen communicated the EPA's position respecting the nutrient limits that would apply to any Live Stream Discharge permits to the parties prior to execution of the FPA. (Theisen Tr. Day 6 at 1203:23-1205:10.)

125.   Under the Clean Water Act, nutrient goals may be set by requiring that the nutrient levels in discharge not exceed levels achievable through the use of the "best available technology" ("BAT") for treating the water prior to discharge. (Trussell Tr. Day 7 at 1608:22-1609:21.)  BAT may be further qualified by considerations of whether the technology is economically feasible. (Trussell Tr. Day 7 at 1609:23-1610:11.)  Under the Clean Water Act, BAT is not generally required of publicly operated treatment plants such as Defendants; it is more commonly applied to private industry dischargers. (Trussell Tr. Day 7 at 1610:17-1611:1.)  The parties, however, chose to incorporate the term BAT into the FPA. (Exh. 49_00003, 6.)  Thus, they examined what nutrient levels the Regional Board was likely to consider as "BAT-Economically Achievable."  By May 1990, Defendants knew that the Regional Board was likely to set BAT-Economically Achievable as 5.0 mg/L for total nitrogen and 0.5 mg/L for total phosphorus. (Exh. 829_00003.)

126.   On August 21, 1990, Regional Board staff issued a Staff Report regarding proposed modifications to the Basin Plan. On September 18, 1990, Regional Board staff issued an Addendum to its earlier Staff Report. (Stip. ¶ 28; *see* Exh. 61 (Addendum Staff Report 90-53.)

127.   Eastern, Rancho, Fallbrook PUD and Camp Pendleton received copies of these staff reports prior to entering into the agreement for Live Stream Discharge, and knew that Regional Board staff's recommendation was to amend the Basin Plan by (1) relaxing TDS limits, and (2) adopting an alternative compliance methodology for nutrient objectives. (Theisen Tr. Day 6 at 1210:16-1214:4; Exh. 61.)

128.   The parties also knew that, if the EPA did not approve the proposed

implementation plan for nutrient objectives, they would be required to establish site specific objectives for nitrogen and phosphorus in order to pursue Live Stream Discharge. (Theisen Tr. Day 6 at 1213:10-19; *see also* Exh. 373.)

129. Finally, the parties knew that the Regional Board would not modify the Basin Plan to allow for Live Stream Discharge to the SMR without the agreement of Camp Pendleton and Fallbrook PUD. (Exh. 112_00032; Theisen Tr. Day 6 at 1190:18-1191:7.)

130. Regional Board staff would not have recommended an amendment to the Basin Plan to change the TDS and nutrient levels if an agreement that provided for downstream mitigation measures such as reverse osmosis had not been simultaneously negotiated by the four parties. (Theisen Tr. Day 6 at 1190:18-1191:23; Welch Tr. Day 12 at 2749:18-2750:14; Exh. 1620_00021; *see infra*, Findings of Fact ¶ 153.)

131. Regional Board staff believed that downstream mitigation was required to comply with California's antidegradation policy. When relaxing water quality objectives (*i.e.*, to allow higher levels of pollutants in discharges to a water body), the Board must make specific findings, pursuant to the antidegradation policy, that allowing the degradation to occur is in the maximum benefit of the people of the State and will not result in the loss of beneficial uses. (Theisen Tr. Day 6 at 1190:18-1191:23.)

132. Prior to entering into the Four Party Agreement on September 21, 1990, neither Eastern nor Rancho had obtained permits for Live Stream Discharge into the SMR. (Stip. ¶ 34.)

### C.    Terms of the Four Party Agreement

133. According to the Four Party Agreement, the United States, Fallbrook PUD, Rancho and Eastern agreed to cooperate in order to obtain the Regional Board's approval of the necessary amendments to the Basin Plan. (Exh. 49_00006, ¶ 1.)

134. Specifically, Plaintiffs agreed to support an amendment to the Basin Plan ("Basin Plan Amendment") that would (1) relax the TDS standards from 500 mg/L to 750 mg/L, and (2) allow "such limits for nitrogen and phosphorus as the Regional Board determines may be achieved through the use of best available technology," rather than the expressed

goals of 1.0 mg/L and 0.1 mg/L, respectively. (Exh. 49_00003, 06.)

135.   The Four Party Agreement obligated the parties to "cooperate and provide such assistance as is necessary," consistent with the terms and conditions stated in the Agreement, to enable Eastern and Rancho to obtain permits for Live Stream Discharge from the Regional Board. (Stip. ¶ 35; Exh. 49_00007, ¶ 3.)

136.   The parties agreed that, although the Live Stream Discharge envisioned in the Four Party Agreement would likely cause initial degradation (*i.e.*, increased levels) of TDS in Camp Pendleton's groundwater, over the long run, the additional flows would dilute the harmful effects of urban runoff caused by the anticipated increased development in the Upper Basin, and assist in maintaining the overall quality of Camp Pendleton's groundwater. (Exh. 49_00003; McPherson Tr. Day 4 at 869:17-870:4, 870:17-871:1.)

137.   The FPA called for Defendants to conduct a small scale demonstration project ("Demonstration Project") prior to commencing a full-scale Live Stream Discharge program. (Exh. 49_00004-05, 07-08; McPherson Tr. Day 4 at 800:3-16.) Thus,

   a.   The FPA stated that the parties would cooperate and provide assistance, as necessary, for Defendants to obtain the Regional Board's approval for the Demonstration Project. (Exh. 49_00003-04, 07.)

   b.   The purpose of the Demonstration Project was to (1) determine the extent of degradation of Camp Pendleton's groundwater that would likely occur as a result of the Live Stream Discharge, (2) identify any measures required to remedy the degradation of Camp Pendleton's water supply in addition to those specifically identified in the agreement, and (3) study "potential impacts" from Live Stream Discharge, including possible degradation of the reclaimed water as it flowed downstream. (Exh. 49_00004-05, 07-08; McPherson Tr. Day 4 at 800:3-16.)

138.   In implementing the Demonstration Project under the Agreement, Defendants were to discharge up to 2.0 MGD of reclaimed water "meeting State of California Title

22 Standards, with average TDS levels up to 750 mg/L and such limits of nitrogen and phosphorus as the Regional Board determines may be achieved through the use of best available technology" into the SMR.  The FPA anticipated that the Demonstration Project would terminate after a period of two years, or after Defendants obtained the Regional Board's approval of NPDES permits for a full-scale Live Stream Discharge project, whichever occurred first.  (Exh. 49_00007, ¶ 3.)

139.   The parties also agreed that, after seeking and obtaining the Basin Plan Amendment, they would "cooperate and provide such assistance as is necessary" to obtain the permits from the Regional Board required to conduct the Live Stream Discharge envisioned by the Four Party Agreement.  (Exh. 49_00006-07, ¶ 2.)

140.   The FPA provided that, if the Basin Plan Amendment was achieved and the required permits obtained, "then the provisions of the balance of this Agreement shall be implemented . . . ."  (Exh. 49_00008.)  These provisions included specific terms for the allocation of any reclaimed water produced by Defendants once full-scale Live Stream Discharge commenced:

> a.    The first 5.0 MGD were to be retained by the Defendants for use or sale in the watershed in the Upper Basin;
>
> b.    The next 2.0 MGD were to be dedicated to stream flows;
>
> c.    Seventy percent (70% ) of the next 28.6 MGD (*i.e.*, 20.02 MGD when producing the full 28.6 MGD) was to be discharged into the SMR for delivery to the Plaintiffs; the remaining 30% of this 28.6 MGD could be retained by the Defendants or sold under separate agreement to the Plaintiffs;
>
> d.    Any amounts produced in excess of those described above could be purchased by Plaintiffs, so long as they could put this water to a reasonable and beneficial use.  (Exh. 49_00009-14.)  If Plaintiffs did not purchase this excess water, it could be sold to third parties, but Eastern and Rancho were required to include, in sales contracts for this water, a provision

1    acknowledging Camp Pendleton's and Fallbrook PUD's "superior right" to

2    reclaimed water pursuant to the FPA. (Exh. 49_00023.)

3    141.   The FPA also called for the parties to cooperate in the preparation of a Watershed

4    Management Plan in order to identify and monitor the impacts that might result from the

5    Live Stream Discharge project.  Eastern was to be the lead agency in preparation and

6    operation of the Plan.  Eastern and Rancho were jointly responsible for "funding the

7    capital implementation (including studies) and operational costs of said Plan (*i.e.*, those

8    costs related to maintenance of Murrieta Creek and/or the Santa Margarita River . . . )."

9    (Exh. 49_00016, ¶ 11.)

10   142.   The FPA memorialized the parties' agreement that the quality of Camp

11   Pendleton's groundwater was being degraded by upstream agricultural drainage and

12   urban runoff, as well as by use and reuse of water on the Base, and that Live Stream

13   Discharge of reclaimed water could cause additional degradation. (Exh. 49_00016, ¶

14   12.)

15   143.   In order to mitigate any additional degradation of Camp Pendleton's groundwater

16   aquifer and supply caused by Live Stream Discharge, the Four Party Agreement called

17   for Defendants to make a significant capital investment (including construction,

18   operation, and maintenance costs) in a reverse osmosis plant at Camp Pendleton, to

19   provide wellhead demineralization. (Exh. 49_00017-22, ¶¶ 12, 15-18.)

20   144.   The FPA also provided that Eastern and Rancho could perform the mitigation

21   upstream, rather than on Camp Pendleton, provided they could still satisfy their

22   obligation to provide Camp Pendleton and Fallbrook PUD with 20.02 MGD of blended

23   potable water, with TDS levels not exceeding 650 mg/L, and nitrogen and phosphorus

24   levels meeting Regional Board and EPA standards. (Exh. 49_00020, ¶ 18; Theisen Tr.

25   Day 6 at 1267:5-11.)

26   145.   The FPA specifically provided that "the Parties agree to act in good faith and

27   exercise due diligence in implementing the provisions of this Agreement." (Exh.

28   49_00024, ¶ 28.)

146.   Further, all parties were obligated to "use sound, established engineering practices and procedures and [to] endeavor to exercise their responsibilities in a reasonable and economically feasible manner consistent with accepted practices in the water utility industry." (Exh. 49_00024, ¶ 28.)

147.   The FPA incorporated an "Implementation Schedule," which by its terms was tentative.  The parties recognized that Live Stream Discharge required approval from various regulatory agencies, including the EPA, and knew that the timing of such approval was "not under the control of any of the parties." (Exh. 49_00027; Carlson Tr. Day 3 at 568:20-569:5.)

148.   Further, the text of the FPA suggests that the parties understood that regulatory approval was not a foregone conclusion.  Paragraph 4 provides that Defendants would be excused from performance under the Agreement:  (1) if State or Federal laws or regulations precluded the Live Stream Discharge contemplated by the FPA; or (2) if Eastern and Rancho were unable to meet the requirements of governing laws and/or regulations without suffering an unreasonable financial burden.  (Exh. 49_00008, ¶ 4.)

149.   Although the FPA did not specifically identify studies that were to be performed pursuant to the Demonstration Project and Watershed Management Plan, adequate identification and monitoring, "including studies," were required to ensure that Live Stream Discharge did not cause significant impacts in the SMR watershed, to determine the extent of additional degradation to Camp Pendleton's groundwater, and to identify appropriate mitigation measures.  (Exh. 49_00004-05, 07, 15-16.)

150.   The FPA was to continue in effect for as long as Camp Pendleton is operated as a military base under the control of the United States Department of Defense.  (Exh. 49_00022.)  The parties understood that the FPA was intended to run in perpetuity. (Hennigar Tr. Day 8 at 1821:16-1822:7; Exh. 152.)

151.   The FPA provided that its provisions would be referenced in the Basin Plan Amendment and incorporated into each Discharge Permit for Live Stream Discharge. (Exh. 49_00025.)

### D.     Performance Under the Four Party Agreement

152.    Pursuant to their obligation under the Four Party Agreement, Plaintiffs supported the Basin Plan Amendment necessary to permit Live Stream Discharge.  (McPherson Tr. Day 4 at 860:19-861:10.)

153.    The FPA and the Basin Plan Amendment were negotiated simultaneously.  Indeed, the Basin Plan Amendment (Resolution No. 90-53) would not have been passed without execution of the FPA.  The Four Party Agreement was executed on Friday, September 21, 1990.  The following Monday, September 24, 1990, the Regional Board amended the Basin Plan by adopting Resolution No. 90-53.  (Stip. ¶ 36; Exh. 207_00013; *see supra*, Findings of Fact ¶ 130.)

154.    The Basin Plan Amendment adopted site-specific objectives for TDS. Specifically, Resolution No. 90-53 relaxed TDS standards for the SMR from 500 mg/L to 750 mg/L for specified sections of Murrieta Creek and the SMR.  The change in TDS limits also applied to groundwater underlying the surface water zone to a depth of 100 feet and encompassing the "10-year flood" width laterally.  In addition to allowing for Live Stream Discharge, Resolution No. 90-53 facilitated and expanded water reclamation in areas of the Murrieta Creek watershed that drain to the Gorge and into the Lower Basin via the SMR.  (Exh. 207; Shahroody Tr. Day 2 at 253:10-255:24; Theisen Tr. Day 6 at 1214:11-1215:9, 1260:14-1261:1; Orton Tr. Day 9 at 1887:11-23; Welch Tr. Day 12 at 2757:4-2758:19.)

155.    Consistent with the draft amendments to the Basin Plan circulated and discussed with the parties prior to execution of the Four Party Agreement (*see supra*, Findings of Fact ¶¶ 123-24), Resolution No. 90-53 maintained 1.0 and 0.1 mg/L as "desired goals" for nitrogen and phosphorus, but provided an alternative methodology for demonstrating compliance with the Basin Plan's narrative objective for nutrients.  (Exhs. 61; 207; Theisen Tr. Day 6 at 1212:9-1214:4.)

156.    This alternative compliance methodology required Defendants to undertake numerous activities in order to demonstrate compliance with Basin Plan objectives,